Town of New Haven *vs.* The City Bank of New Haven.

The capital of a bank embraces all its property, real and personal.

Where the capital stock of a bank is exempted from taxation by its charter, its banking house is equally exempt with every other part of its capital.

If a bank has, in violation of its charter, erected a building not needed for banking purposes, the building is not for that reason liable to taxation as the property of the bank when it otherwise would not be, but the bank is liable to be proceeded against by the state for the violation of its charter.

AMICABLE submission to the superior court, upon the following agreed statement of facts :

The City Bank of New Haven was incorporated in the year 1831, the charter, which was a close one, containing the following provision :—

" The bank by its president, whenever and as soon as it shall become organized under its charter, shall subscribe to the capital stock of the Hampshire and Hampden Canal Corporation the sum of one hundred thousand dollars, being one thousand shares, to become part and parcel of the stock of said canal corporation ; and in consideration of said subscription to said canal corporation, the capital stock of said bank shall be and remain free from taxation, until the tolls collected by said canal corporation shall be sufficient to afford a dividend of six percent per annum on their capital stock, after which the stock of said bank shall be liable to taxation in the same manner as other bank stock."

The bank made the subscription required, to the capital

New Haven *v.* City Bank.

stock of the canal corporation, and the latter has never collected tolls sufficient to afford a dividend of six per cent per annum on its stock.

In 1851, the bank, then owning no banking house or place of business, purchased a lot on the corner of Chapel and Orange streets, in the city of New Haven, and erected thereon a valuable stone building, suitable for a banking house, twenty-eight feet front by sixty feet in depth, and forty feet in height, and corresponding in style with other buildings on the street. In the plan of the building it became a question whether there should be a dome over the main banking room with a sky-light, or a second story room. The latter was adopted, in view of the probable occupancy of the room by the bank for their own purposes, and also with a view to renting it from time to time for temporary purposes, when not wanted by the bank. There are two entrances to the building, one in front on Chapel street, to the main banking room, and one in the rear on Orange street, furnishing access to the main banking room and to the second floor. There are three rooms on the second floor, two in the rear, one of which is used by the bank for a storing room, and the other is now and always has been unused, except as a passage way to the storing room, and temporarily as a lodging room for clerks. The remaining room, being the one over the main banking room, was, during the year 1860, rented by the bank to the State Fire Insurance Company, and was during the whole of that year occupied by that company, to the exclusion of the bank. The original cost of the lot and building was $28,000, which was paid out of the capital stock of the bank, and there has been no time since the purchase when the bank could have returned its capital stock to the stockholders, without appropriating its banking house, in addition to its other assets, for that purpose.

In the year 1854 the legislature passed the following act :

" The real estate belonging to any bank, over and above what may be required and used by such bank for the transaction of its appropriate business, shall be liable to be assessed and set in the list of such corporation in the town where such

real estate is situated, and shall be liable to taxation to the same extent as if owned by an individual."

The upper story of the banking house of the City Bank was claimed by the town of New Haven to be liable to taxation in the town, and in the year 1860 was placed in the tax list by the assessors of the town and valued at $6,000.

The question was submitted to the court whether the property was legally taxable by the town or not.

Upon the facts so agreed the case was reserved by the superior court for the advice of this court.

*C. R. Ingersoll,* for the Town of New Haven, cited Act of 1826, Rev. Stat., Ed. 1838, p. 606 ; *Salem Iron Factory Co.* v. *Danvers,* 10 Mass., 514 ; *Goodell Manufacturing Co.* v. *Trask,* 11 Pick., 514 ; *Cumberland Marine Railway* v. *Portland,* 37 Maine, 444 ; *Philadelphia & Wilmington R. R. Co.* v. *Maryland,* 10 How., 376 ; *Vermont Central R. R. Co.* v. *Burlington,* 28 Verm., 193 ; *Proprietors &c.* v. *City of Lowell,* 1 Met., 538 ; *Worcester* v. *Western R. R. Co.,* 4 id., 564 ; *Railroad* v. *Berks County,* 6 Penn. S. R., 70 ; *State* v. *Commissioners of Mansfield,* 3 Zabr., 510 ; *Purvis* v. *Traill,* 3 Exch., 344 ; *Regina* v. *Overseers of Manchester,* 3 Eng. Law & Eq., 314 ; *Clarendon* v. *Rector of St. James,* 5 id., 393.

*Beach,* for the City Bank, cited *State Bank* v. *Brackenridge,* 7 Blackf., 397 ; *State* v. *Berry,* 2 Harrison, 81 ; *Gordon's Exr.* v. *Baltimore,* 5 Gill, 231 ; *Baltimore* v. *Ohio R. R. Co.,* 6 id., 296 ; *Tax cases,* 12 Gill & Johns., 117 ; *Gardner* v. *The State,* 1 Zabr., 560 ; *State* v. *Branin,* 3 id., 500 ; *State* v. *Commissioners of Mansfield,* id., 510 ; *State* v. *Tunis,* id., 547 ; *State* v. *Flavell,* 4 id., 370 ; *State* v. *Betts,* id., 555 ; *State Bank* v. *People,* 4 Scam., 303 ; *Gordon* v. *Appeal Tax Court,* 3 How., 133 ; *Watson* v. *Spratley,* 28 Eng. Law & Eq., 515.

SANFORD, J. The absolute inviolability of the contract between the sovereign power of the state and the City Bank,

New Haven *v.* City Bank.

by which the former undertook that the "capital stock" of the latter should be and forever remain free from taxation (until the happening of an event not yet arrived) is conceded. The only question between the parties is, what is "the capital stock" thus exempted.

The object for which a banking company is incorporated is well understood and needs no elucidation or remark. But in the solution of the question now submitted to us we may derive some assistance from the consideration that although created for the purposes of trade the corporation had originally nothing to trade in. All its property, its capital, its stock, was contributed by individual subscribers from their private funds, and was by them intrusted to its keeping and its management for their benefit, taking from it no tangible property in return, nothing but the evidence of their contributions and their consequent interest in the common fund or capital stock thus contributed.

Originally then, "the capital stock of the bank" was all the property of every kind, every thing, which the bank possessed. And this "capital stock," all of it, in reality belonged to the contributors, it being intrusted to the bank to be used and traded with for their exclusive benefit; and thus the bank became the agent of the contributors, so that the transmutation of the money originally advanced by the subscribers, into property of other kinds, though it altered the form of the investment, left its beneficial ownership unaffected; and every new acquisition of property, by exchange or otherwise, was an acquisition for the original subscribers or their representatives, their respective interests in it all, always continuing in the same proportion as in the aggregate capital originally advanced. So that, whether in the form of money, bills of exchange, or any other property in possession or in action into which the money originally contributed has been changed or which it has produced, all is, as the original contribution was, the capital stock of the bank, held as the original contribution was, for the exclusive benefit of the original contributors and those who represent them. The original contributors and those who represent them are the stockholders. Each one of

them holds an undivided portion of the entire stock, and together they hold all the stock of the corporation. The stock certificate which each of them holds is the muniment of his title, specifying his proportion of interest in all the property of the corporation, and all these stock certificates together represent the entire property of the bank, in whatever form it may exist.

By the terms of the charter the capital stock of the bank was to consist of five thousand shares of one hundred dollars each. Had that amount been subscribed and at once paid in, the money so accumulated would have been the capital stock of the bank, and as such exempted from taxation. And when one hundred thousand dollars of the money thus accumulated had been paid out by the bank on its subscription for stock of the Hampshire and Hampden Canal Corporation, that canal stock took the place of the money paid for it, and became *pro tanto* capital stock of the City Bank, and exempt, as the money was, from taxation. And so when afterwards, for debts previously contracted, houses, lands or goods were necessarily taken in payment, such houses, lands or goods became, in lieu of the money for which they were received, part of the capital stock, and entitled to the same exemption. Otherwise the canal stock thus purchased, and the houses, lands and goods thus acquired, might be taxed, and thus the promised exemption, purchased by the shareholders, and assured to them by the charter, would be rendered worthless and delusive.

We see no reason for a distinction in this respect between real estate so taken by the bank in payment of a debt, and the real estate which is the subject of this controversy.

The right to erect a building, suitable and proper for the transaction in it of the business authorized by the legislature, is undeniable. The grant of a right carries with it as an incident the grant of suitable and proper means to enable the grantee to exercise that right and to reap and enjoy its fruits. And the case states that the building erected by the City Bank was a suitable and proper one for a banking house in that locality. It became as legitimately the property of the bank, legally acquired and held under the charter, as the houses

and lands taken in payment of debts previously contracted. The entire cost of the building was paid, and properly paid, out of " the capital stock " existing in the form of money, and thus the building became what the money paid for it was, capital stock in its stead. In putting on the second story of the building the directors may have made an unprofitable, or otherwise ill advised investment of the stock, but of such investment, unless it was illegal, none but the stockholders can complain.

And if the bank has violated its charter by investing a part of its capital in a way prohibited, it may be liable to the forfeiture of its franchises, but this is not the time or the place for the infliction of such a penalty.

But the primary object of the bank in erecting the building was the accommodation of the proper business of the bank, and the temporary renting of the room was but an incident to the ownership, neither affecting the title to the property nor the right to hold it free from taxation.

We are satisfied that the property in question is to be regarded as part of the capital stock of the corporation, and therefore exempted from taxation by the express provisions of the charter.

We can not, in the absence of explicit declarations to that effect, impute to the legislature an intention to provide merely that the shareholders should be individually exempt from taxation on account of their respective interests in the property of the bank, while it retained the power and right to assess and tax all or any portion of that property against the bank itself. Such reservation of right would render the promised exemption a worthless figment.

But it is said there is an obvious distinction between the real property of a corporation and the shares of capital stock in the hands of its stockholders, and we may add that there is the same difference between the *personal* property of the corporation and its stock in the hands of the stockholders; but this consideration goes but a very little way, if at all, toward the solution of the question now before us. That question is, whether the promised exemption, which confes-

sedly covers the intangible ideal rights called shares in the hands of the stockholders, covers also the property, real and personal, in which the whole value of those shares consists; whether it is possible to impose a tax upon the latter, without having the entire burden of the imposition fall upon the former; and if it is not, whether the construction contended for by the town can be the true construction of the grant. And for the purposes of this question, we can see no difference between the real and personal property held by the corporation. The shares of the capital stock cover and include them both.

Again, it is said that the distinction contended for by the town "was recognized by the legislature in its policy of taxation at the time the charter of the City Bank was granted;" and in support of this position we are referred to the proviso of the act of 1826, (Stat. ed. 1838, p. 606.) But we think the only purpose and effect of the act of 1826 was to designate the town within which the personal property of a corporation should be taxed, when the stock of such corporation was not otherwise taxed at all.

At the time that statute was enacted the "capital stock" of no corporation, except of banking and insurance companies, and "turnpike companies whose stock netted six per cent," was taxed against the individual shareholders at all, but the real and personal property of all other corporations was assessed and taxed against the corporation in the same manner as property owned by natural persons. But as personal property follows the person of its owner wherever he resides, and as this court had decided that a corporation which has no local limits is not, for the purposes of taxation, an inhabitant of any town, (*Hartford Fire Ins. Co.* v. *Hartford*, 3 Conn., 15,) and as the number of corporations for manufacturing and other purposes had greatly increased, it became important to determine by law where their property should be taxed, and hence the statute of 1826 provided that their personal property, liable to be assessed at all, should be assessed in the town where the manufacturing house or other principal house or place of business should be situated; or if

there should be more than one such place, then in the town where the clerk of such corporation should reside. And the proviso that the act should not be construed to render taxable the personal property of any corporation whose stock was exempt from taxation, was added out of abundant caution, lest it might be supposed that the legislature intended by this act to subject to taxation property represented by capital stock, and in that form already taxed; the language of the proviso very naturally being co-extensive only with the language of the enactment. It does not seem to have been in the contemplation of the legislature, either in the enacting clause or in the proviso, to give any such effect to the distinction between the real and personal property of a corporation as the counsel claim.

That this is the true construction of the act of 1826 we think is manifest from its title, as well as its terms; and from another statute upon the same subject, passed in 1828, (Stat. ed. 1838, p. 606,) which provides that " whenever any manufacturing company or corporation shall have more than one place of manufacturing or transacting business, and they shall be situated in different towns, such company or corporation shall be liable to be assessed and taxed for each such establishment, and for the personal property attached thereto, in the town where such establishment or establishments may be situated."

The existing statute for the assessment and collection of taxes, (Rev. Stat., Comp. 1854, p. 840, sec. 10,) embodies in its provisions the acts of 1826 and 1828, and confirms the views above expressed. It enacts that the whole property, real and personal, of any corporation, except banks, savings societies, insurance, railroad, turnpike, bridge, and plank road companies, and other communities or corporations whose property is expressly exempted by the terms of their charter or by the provisions of the act, shall be assessed and taxed in the same manner as if owned by a natural person; the real estate in the town in which it is situated, and the personal estate in the town in which the corporation has its principal

place of business, or exercises its corporate powers ; and that whenever such corporation shall have two or more establishments for transacting its business, situated in different towns, the corporation shall be assessed and taxed for every such establishment, and for the personal property attached thereto or connected therewith, in the town in which such establishment may be situated ; and that the individual stockholders of any such corporation, the whole property of which is assessed and taxed in the name of such corporations, shall be exempted from taxation for the shares of such capital stock owned by them respectively.

This statute also exhibits in a clear light the general policy of the legislature, to avoid the double taxation of the same property, once in the name of the corporation and again in the names of the holders of the stock, and by implication recognizes the substantial identity of the property and the shares of capital stock by which that property is represented.

In regard to corporations whose stock is not by the terms of their charters exempt from taxation, the statute is indeed imperative, that all real estate belonging to any bank or insurance company, or other private corporation, over and above what may be required and used by such bank, &c., for the transaction of its appropriate business, shall be liable to be assessed and set in the list of such corporation in the town where such real estate is situated, and shall be taxed to the same extent as if owned by an individual." Rev. Stat., Comp. 1854, p. 846. But that statute in no manner affects corporations whose stock or property is by their charters exempted from taxation.

An examination of the cases to which our attention was invited by the counsel for the town, has failed to convince us of the incorrectness of the views above expressed. In no one of those cases has the precise question before us been decided, and in all of them the decisions seem to have been governed by some peculiar local statute, or by considerations which we think inapplicable in the case before us.

We advise the superior court that the real estate in ques-

tion is not liable to taxation, and that judgment be rendered in favor of the City Bank.

In this opinion the other judges concurred.